586 F.2d 1096
 18 Fair Empl.Prac.Cas. 225, 18 Empl. Prac.
Dec. P 8646
Hubert MORELOCK et al., Plaintiffs-Appellants,
v.
The NCR CORPORATION, Defendant-Appellee.
 Nos. 75-2220, 75-2282.
 United States Court of Appeals,
Sixth Circuit.
 Argued June 9, 1978.
Decided Oct. 6, 1978.
Rehearing and Rehearing En Banc Denied Nov. 9, 1978.
 
 John B. Huber, Dayton, Ohio, for plaintiffs-appellants.
 Carin Ann Clauss, Associate Sol., U. S. Dept. of Labor, Washington, D. C., for amicus curias.
 Thomas J. Harrington, Pickrel, Schaefer & Ebeling, Gordon H. Savage, Dayton, Ohio, Robert E. Signom, II, Legal Dept., NCR Corp., Dayton, Ohio, for defendant-appellee.
 Before WEICK, ENGEL and MERRITT, Circuit Judges.
 WEICK, Circuit Judge.
 
 
 1
 This is a private action brought under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621, Et seq., against The NCR Corporation (NCR or "Company"). Plaintiffs, Hubert Morelock, William Evans, Eugene Borgerding, Clayton Metcalf and Ralph Saunders[1] are present or former employees of NCR at its Dayton, Ohio facilities who either lost their jobs or feared the loss of their jobs through a reduction in the work force at the Dayton facilities, which reduction commenced on October 13, 1972. In essence, they allege that NCR conducted its reduction in the work force pursuant to a seniority system which was not bona fide within the meaning of § 4(f)(2) of the ADEA, 29 U.S.C. § 623(f)(2). They sought Inter alia, back pay, damages, reinstatement and an injunction enjoining NCR from discriminating against them on the basis of their age.
 
 
 2
 The District Court denied NCR's motion to strike plaintiffs' demand for a jury trial and ordered the issue of liability to be tried to a jury. Before submitting the case to the jury, the Court reserved NCR's motion for a directed verdict. The jury returned a verdict in favor of each plaintiff. After the verdict was rendered, NCR renewed its motion for a directed verdict and also moved for judgment notwithstanding the verdict (n. o. v.) and in the alternative, for a new trial. The District Court granted the motion for judgment n. o. v. and conditionally granted the motion for a new trial in accordance with the provisions of Fed.R.Civ.Pro. 50(c).
 
 
 3
 Plaintiffs appealed, assigning as error Inter alia the trial court's granting of NCR's motions for judgment n. o. v. and a new trial. NCR cross-appealed, raising the additional issues of (1) the propriety of a jury trial in a private civil action brought under the ADEA; (2) whether plaintiffs' action was time-barred by the applicable statute of limitations; and (3) whether each plaintiff was required to file a written consent to become a party plaintiff in the lawsuit, under the provisions of 29 U.S.C. § 256.[2]
 
 
 4
 The appeal was argued before a panel of this Court on June 16, 1976. In an opinion filed on December 20, 1976, we held that there was no right to a jury trial in a private action under the ADEA. See 6 Cir., 546 F.2d 682. Consequently, we found that the jury empaneled by the District Court was in effect, an advisory jury, whose use did not relieve the District Court of its duty to make findings of fact and conclusions of law as required by Fed.R.Civ.Pro. 52. Because the District Court failed to do this, we vacated its judgment and remanded the case to the District Court for the entering of findings of fact and conclusions of law.[3]
 
 
 5
 Subsequently, plaintiffs filed with this Court a petition for rehearing, with a suggestion for a rehearing en banc. After our denial of that petition, plaintiffs petitioned the Supreme Court for a writ of certiorari.
 
 
 6
 On February 22, 1978, the Supreme Court announced its decision in Lorillard v. Pons, 434 U.S. 575, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978), which held that there is a right to a trial by jury in a private civil action for lost wages under the ADEA. The Supreme Court on March 6, 1978 vacated our judgment in the instant case and remanded the case to us for further consideration in light of Lorillard v. Pons, supra; Morelock v. NCR Corporation, 435 U.S. 911, 98 S.Ct. 1463, 55 L.Ed.2d 503 (1978).[4]
 
 
 7
 Upon the remand to our Court, supplemental briefs were filed and the appeal was argued for a second time before a panel of this Court. By reason of the fact that the District Court tried the question of liability to a jury as required by Lorillard v. Pons, supra, we find that the issues raised by the parties are now ripe for disposition and accordingly, we reach the merits of this appeal.[5]
 
 
 8
 We hold that this action was timely commenced within the applicable limitations period and that plaintiffs were not required to file written consents to become parties to this action. Furthermore, we affirm the District Court's grant of judgment n. o. v. and therefore, we find it unnecessary to reach the questions raised by plaintiffs with respect to the District Court's conditional grant of a new trial.
 
 
 9
 * NCR is engaged in the production of business machines. Prior to 1972, almost one-half of its work force was employed in its facilities at its headquarters in Dayton, Ohio. During the early 1970's, the products of NCR changed from mechanical business machines to electronic business machines. The Company in 1972, in conjunction with this change in product line and therefore in production operations, embarked upon a "decentralization program" designed to reduce the level of operations at its Dayton facilities. The reductions in its work force which occurred in Dayton as a consequence of decentralization decreased the number of employees there from a peak of approximately 21,000 in 1970 to around 8000 at the time of trial.
 
 
 10
 Prior to 1964, almost all of NCR's Class "D" employees in the Dayton facilities were in a single collective bargaining unit, represented for purposes of collective bargaining, by the NCR Employees Independent Union of Dayton, Ohio (Union). The National Labor Relations Board (NLRB) in 1964, ordered that this bargaining unit be divided into two bargaining units namely, an "office and technical employees" bargaining unit and a "production and maintenance employees" bargaining unit. The Union continued as the collective bargaining representative of both units. Plaintiffs, because of the jobs they then held, became members of the office and technical employees' bargaining unit.
 
 
 11
 The seniority system applicable in 1972 to NCR's office and technical personnel, was derived from collective bargaining agreements entered into between the Company and the Union in 1964 and 1968. That system was based on the concept of vocational seniority. Pursuant to that concept, all of the jobs within the office and technical employees' bargaining unit were divided or grouped into vocational classifications. Seniority accrued by vocation. An employee acquired seniority upon the completion of six months' continuous service with the Company. An employee's seniority in his vocation was equal to the total amount of his continuous service with NCR. Upon transfer to a new vocation, an employee's seniority in his previous vocation immediately carried over to his new vocation so that his seniority in the vocation to which he was transferred was equal to his total seniority.
 
 
 12
 Layoffs were conducted on a departmental basis. An employee's seniority gave him certain displacement or "bumping" rights in the event his department was faced with a reduction in its work force. In the event of a reduction in the work force of a department, an employee could not be laid off unless he was the least senior in terms of service in his vocation in that department. An employee laid off in one department had the right to bump an employee with the least seniority in his vocation in the entire bargaining unit.
 
 
 13
 However, when the laid-off employee had the least seniority in his vocation in the bargaining unit, he still possessed what was known as "time increment bumping" rights. Those rights entitled him to bump an employee having no seniority (i. e., with less than six months' continuous service with the Company) in any other vocation within the bargaining unit and whose job he could perform. If there were no such person, the laid-off employee could displace an employee in any other vocation with six months' to one year's seniority provided he could perform the work. In the event there were no persons in the bargaining unit with six months' to one year's seniority that the laid-off employee was qualified to replace, he could be assigned by the Company to bump an employee whose job he could perform, having one year's to two years' seniority, then two years' to three years' seniority, and so on until all the remaining office and technical employees had more seniority than such laid-off employee. However, the laid-off employee was required to bump the employee with the least seniority whose job he could perform.
 
 
 14
 Plaintiffs, as of October 13, 1972, were all in the vocational classification known as Senior Developmental Electronics Technicians (senior techs). Another classification of electronics technicians, denominated Developmental Electronics Technicians also existed at that time.[6] These two vocational classifications were created by the 1964 collective bargaining agreement. Prior to that agreement, NCR had but a single classification of electronics technicians and it was the 1964 agreement which provided that electronics technicians already employed by NCR became "senior techs." That agreement further created the new vocational classification of electronics technicians, namely, the junior techs. The classifications were to distinguish between electronics technicians on the basis of skill, ability, and experience. Four of the plaintiffs, (Morelock, Evans, Metcalf and Saunders) were electronics technicians in 1964 and were made senior techs in 1965 when the 1964 agreement became effective. The remaining plaintiff (Borgerding) became a junior tech in 1967 and a senior tech in 1970.
 
 
 15
 Because both the senior tech and junior tech vocational classifications were in the Research, Development and Engineering Area (RDE Area) as defined by the 1964 collective bargaining agreement, a senior tech laid off from his vocation in a reduction in the work force in his department, could potentially bump back into the junior tech vocation.[7] The 1968 collective bargaining agreement, although retaining the two electronics technicians' vocations, made radical changes in the method of acquiring seniority in one's vocation. One of the changes eliminated the right of RDE Area employees laid off from their vocation to bump back to vocations in which they had previously worked in the RDE Area and thereby, for all practical purposes, prevented a laid-off senior tech from reverting to the junior tech vocation in the event of a reduction in NCR's work force.
 
 
 16
 As a result of a petition filed with the NLRB in 1971, a decertification election was conducted by the NLRB in which a majority of the employees of the office and technical bargaining unit voted to have no collective bargaining agent represent them. During the period prior to the election, NCR had sent letters to all its office and technical employees advising them that in the event the vote resulted in no union representation, the Company would continue to use, among other things, the seniority system established by the 1968 collective bargaining agreement for purposes of determining those workers to be laid off.
 
 
 17
 In accordance with this assertion, after the decertification of the Union, NCR issued an employee's handbook covering its employment practices for its Dayton office and technical personnel, continuing the seniority provisions of the 1968 collective bargaining agreement, for purposes of layoffs. There were however, minor changes in the time increment bumping rights. Thus, for all practical purposes, the seniority system derived from the 1964 and 1968 collective bargaining agreements was the seniority system used by NCR to effectuate its decentralization.
 
 
 18
 It was stipulated at trial that between October 13, 1972 and June 26, 1973, many electronics technicians in both categories were laid off for lack of work, as part of a general large scale reduction in work force at the Dayton facilities. These reductions in the work force were accomplished in exact accordance with the seniority system. Laid-off senior techs were unable to bump into the junior tech vocation because of the division of electronics technicians into two vocational classifications and because of the elimination of the right of RDE Area employees, laid off from their vocations, to bump back to prior vocations in the RDE Area. In the process of layoffs, the five plaintiffs were affected as follows:
 
 
 19
 (1) Hubert Morelock lost his position as a senior tech on June 25, 1973, having had the least seniority in that vocation at that time. Upon notification of the layoff, he was sent to the employment office where his time increment bumping rights were used to place him in the position of an order proofreader in the Manual Clerk's vocation. Approximately three months later, Morelock began a one-year sick leave. In September 1974 he retired as totally and permanently disabled.
 
 
 20
 (2) Eugene Borgerding was laid off as a senior tech on June 25, 1973. The application of his time increment bumping rights placed him in a job as a copy machine operator in the Duplicating Equipment Operators and Clerks vocation. Seventeen weeks later, he was recalled to his former position as a senior tech.
 
 
 21
 (3) William Evans was never laid off. Instead, he transferred from his position as a senior tech in the Dayton facilities to a position as a senior tech at NCR's Miamisburg, Ohio facility.
 
 
 22
 (4) Clayton Metcalf did not lose his job as a senior tech. Instead, he was shuffled from one department to another, as he bumped other senior techs with less seniority. However, at the time of the suit, he had the least seniority among the remaining senior techs and therefore would be the next senior tech laid off.
 
 
 23
 (5) Ralph Saunders lost his position as a senior tech on March 26, 1973, because he was the least senior in that vocation at that time. The implementation of his time increment bumping rights placed him in a position as a mail sorter in the Manual Clerk vocation. In December 1973, he transferred to NCR's Miamisburg facility as a lab aid. After becoming a junior tech at Miamisburg, Saunders, on October 19, 1974 regained his position there as a senior tech.
 
 II
 
 24
 NCR advances two arguments which it asserts eliminates the necessity for this Court to reach the merits of this appeal. First, it maintains that the District Court erred in denying NCR's motion to dismiss plaintiffs' action as time barred under § 7(e) of the ADEA, 29 U.S.C. § 626(e), which incorporates the limitations periods (§ 6) of the Portal-to-Portal Act of 1947, 29 U.S.C. § 255. Pursuant to that latter section, suit must be commenced within two years from the date of the discriminatory occurrence. An additional year is added when the discrimination is found to be willful, extending the time limit to three years.
 
 
 25
 NCR argues that because the essence of plaintiffs' cause of action is the allegation that the Company's seniority system discriminates against NCR employees on the basis of age, plaintiffs' cause of action accrued in 1968, the date when the seniority system in effect at the time of the 1972 reductions in force was first adopted. Thus, even if the three-year statute of limitations applicable to willful violation of the ADEA is the appropriate limitations period on the facts of this case, NCR concludes that plaintiffs' action is time barred because plaintiffs did not commence suit until March 4, 1974, more than three years after the adoption of the alleged discriminatory seniority system. We disagree with this contention.
 
 
 26
 The adoption of NCR's argument would in effect, emasculate § 4(f)(2) of the ADEA, 29 U.S.C. § 623(f)(2), which proscribes the observance of non-bona fide seniority systems. To accept NCR's argument would permit perpetual age discrimination through a seniority system by an employer whose violation had already continued without attack for three years. Thus, for example, an employee hired more than three years after the implementation of a seniority system could never challenge its validity.
 
 
 27
 We hold that the adoption of a seniority system, if discriminatory as to age, constitutes a continuing violation of the ADEA as long as that system is maintained by the employer. An employee's cause of action for an alleged act of age discrimination caused by a discriminatory seniority system, does not accrue until his employment opportunities are adversely affected by the application to him of the provisions of that seniority system. Thus in the instant case, plaintiffs' cause of action accrued at the time the plaintiffs were laid off from their positions as senior techs. The present action was commenced well within even the two-year limitation period (for non-willful violations of the ADEA).
 
 
 28
 NCR secondly maintains that the District Court erred in failing to dismiss plaintiffs' action on the ground that plaintiffs failed to file written consents to be parties to the lawsuit as required by 29 U.S.C. § 256. Section 256 is not incorporated by reference into the ADEA, and therefore we fail to see how it could be applicable to age discrimination suits. We note however, that 29 U.S.C. § 216(b) is incorporated by reference into the ADEA, 29 U.S.C. § 626(b), and provides in pertinent part:
 
 
 29
 An action to recover the liability prescribed in either of the preceding sentences may be maintained against any employer (ncluding a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.
 
 
 30
 The consent requirement of § 216(b), like that of § 255 is apposite solely to representative actions. Plaintiff's complaint states a separate cause of action for each named plaintiff. Individual relief is sought for each of the plaintiffs. No plaintiff purports to represent anyone other than himself. As this is not a representative suit, there was no need for plaintiffs to have filed "consent(s) in writing." Wallace v. Water Tank Service Co., 256 F.Supp. 689, 690 (W.D.Okl.1966); Mitchell v. Mace Produce Co., 163 F.Supp. 342, 346-47 (D.Md.1958); MacDonald v. Martinelli, 120 F.Supp. 383 (S.D.N.Y.1950); Deley v. Atlantic Box & Lumber Corp., 119 F.Supp. 727, 728-29 (D.N.J.1954).
 
 III
 
 31
 The District Court in its order granting NCR's motion for judgment n. o. v., set forth the standard for determining whether judgment n. o. v. should be entered, as follows:
 
 
 32
 The standard of inquiry in this circuit is the "substantial evidence" rule. Solomon v. United States, 276 F.2d 669 (6th Cir. 1960); Hinton v. Dixie-Ohio Express Co., 18(8) F.2d 121 (6th Cir.); Scott v. United States, 161 F.2d 1009 (6th Cir.).
 
 
 33
 It is clear from the above authorities that the motions must be overruled unless viewing the evidence in the light most favorable to the plaintiff there would be no substantial evidence to support a jury verdict.
 
 Applying that test, the Court concluded:
 
 34
 A consideration of the evidence presented indicated that three of the plaintiffs, Hubert Morelock, Eugene Borgerding, and Ralph Saunders, were reduced in grade in reverse order of seniority during a reduction in force at defendant's plant. Plaintiffs Clayton Metcalf and William Evans were never reduced in rank. No substantial evidence, in this Court's opinion, was presented supporting plaintiffs' contentions of a violation of the Age Discrimination in Employment Act. 29 U.S.C. § 621 Et seq. There being a lack of substantial evidence, the motion for judgment non obstante veredicto is hereby GRANTED.
 
 
 35
 Plaintiffs first maintain that the District Court applied an incorrect standard in granting judgment n. o. v. The plaintiffs argue that because the word "substantial" connotes equally well either a qualitative or a quantitative meaning, the trial court's formulation of the test for determining whether to enter judgment n. o. v., evinces an improper weighing of the evidence by that court. We do not agree.
 
 
 36
 The standard to be applied in determining the propriety of entering judgment n. o. v. has been articulated in many ways. Simblest v. Maynard, 427 F.2d 1, 4 (2d Cir. 1970); Boeing Co. v. Shipman, 411 F.2d 365, 374 (5th Cir. 1969); 5A Moore's Federal Practice, P 50.02(1), at 50-25 (2d ed. 1977); 9 Wright & Miller, Federal Practice and Procedure § 2524, at 545-47 (1971).
 
 
 37
 A number of decisions of this Court[8] as well as other Courts of Appeals[9] have stated that a motion for judgment n. o. v. must be granted unless there is "substantial evidence" in opposition to it. We agree with plaintiffs that the preferred formulation of the test for granting judgment n. o. v. is the so-called "reasonable minds" test.[10] Yet, in light of the precedent supporting the standard used by the District Court, and in view of the fact that there is no evidence on the record which indicates that the trial judge weighed the evidence, we find no prejudicial error. As stated by a leading authority on federal civil procedure:
 
 
 38
 Although . . . courts have used other phrases than the one preferred here (namely, the reasonable minds test) to describe the standard of sufficiency of evidence, it is unlikely that there is any real difference in result.
 
 
 39
 Wright & Miller, Supra § 2524, at 547. (Footnote omitted).
 
 
 40
 Plaintiffs next argue that even if the District Court used a proper standard in determining the sufficiency of the evidence, it erred in granting judgment n. o. v. on the facts of this case.
 
 
 41
 The issue raised by a motion for a judgment n. o. v. is whether there is sufficient evidence to raise a question of fact for the jury. O'Neill v. Kiledjian, 511 F.2d 511, 513 (6th Cir. 1975). This determination is one of law to be made by the trial court in the first instance. Id. In determining whether the evidence is sufficient, the trial court may neither weigh the evidence, pass on the credibility of witnesses nor substitute its judgment for that of the jury. Rather, the evidence must be viewed in the light most favorable to the party against whom the motion is made, drawing from that evidence all reasonable inferences in his favor. See Gillham v. Admiral Corp., 523 F.2d 102, 109 (6th Cir. 1975), Cert. denied, 424 U.S. 913, 96 S.Ct. 1113, 47 L.Ed.2d 318 (1976). If, after thus viewing the evidence, the trial court is of the opinion that it points so strongly in favor of the movant that reasonable minds could not come to a different conclusion, then the motion should be granted. Id. at 109; Reeves v. Power Tools, Inc., 474 F.2d 375, 380 (6th Cir. 1973); 9 Wright & Miller, Federal Practice and Procedure § 2524 (1971). An appellate court when reviewing the trial court's decision is bound by the same standard. Gillham v. Admiral Corp., supra, 523 F.2d at 109; O'Neill v. Kiledjian, supra, 511 F.2d at 513.
 
 
 42
 The ADEA covers persons between the ages of 40 and 65 years of age[11] and makes it unlawful, Inter alia, for an employer to:
 
 
 43
 limit, segregate or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age; . . . .
 
 
 44
 29 U.S.C. § 623(a)(2).
 
 
 45
 It is further provided in § 4(f)(2) of the ADEA, 29 U.S.C. § 623(f)(2), that it is not unlawful for an employer to "observe the terms of a bona fide seniority system . . . , which is not a subterfuge to evade the purposes of this chapter . . . ."
 
 
 46
 Although not clearly articulated in their briefs on appeal, plaintiffs appear to assert two arguments. First, they apparently maintain that the evidence establishes that NCR's seniority system is not bona fide because the purpose and effect of the creation of two separate classifications of electronics technicians was to create classifications of electronics technicians based solely on age. Plaintiffs further appear to argue that even if the seniority system is bona fide, the evidence shows that NCR used it as a subterfuge to effectuate age discrimination against plaintiffs in the 1972-1973 reductions in force.
 
 
 47
 We turn first to the question of whether NCR's seniority system was bona fide. When the evidence is viewed in a light most favorable to the plaintiffs, we are unable to find any evidence which supports a conclusion that the seniority system is not bona fide.[12]
 
 
 48
 First, the division of NCR electronics technicians into two separate and distinct vocational classifications for purposes of seniority was the result of collective bargaining negotiations conducted between the Company and the Union. The separation commenced by the terms of the 1964 collective bargaining agreement which created the two electronics technicians categories, and was consummated by the 1968 collective bargaining agreement which eliminated the right of RDE Area employees who were laid off, to bump back into prior vocations in which they formerly worked in the RDE Area. There is no evidence in the record which supports a conclusion that either the creation of the two classifications of electronics technicians or the elimination of the rights of senior techs to bump junior techs had their origin in or were maintained for the purpose of age discrimination. To the contrary, the uncontroverted evidence in this case shows that the motive for the creation of two electronics technician vocations was economic, that is, to permit NCR to hire inexperienced technicians at a lower salary than that paid to experienced electronics technicians already in the employ of the Company. The classifications were based not on age, but on skill and ability. App. at 298, 316, 346-47.
 
 
 49
 There is simply no evidence in the record which indicates a reason for the change by the 1968 collective bargaining agreement, of the bumping rights of the RDE Area employees. Plaintiffs maintain that the testimony of their expert witness, Thomas Nisbet, demonstrates that NCR knew as early as 1964 of the need for decentralization (with its attendant reduction in force) of its operations at its Dayton facilities. From this fact, plaintiffs argue that the jury was entitled to infer that the alterations in bumping rights effected by the 1968 agreement were made in order to isolate older electronics technicians in the senior tech vocation. However, the record is devoid of any such prescience on the part of NCR. Nisbet's testimony refers to a speech made by one of NCR's department heads, not in 1964 or in 1968 but In 1974 and dealt with the Company's policies as they existed in 1974. App. at 435-37. In fact, the only evidence in the record shows that the Company was hiring workers during the period between 1964 and 1971, App. at 534, 573, 586, and that decentralization commenced in 1972. App. at 589.
 
 
 50
 Plaintiffs further point to the fact that the use of the adjectives "senior" and "junior" to describe both the two classifications of electronics technicians and other job classifications is indicia of age discrimination. We do not agree. These words when used in connection with a job description connote job duties and responsibilities rather than age. See Hodgson v. Approved Personnel Service, Inc., 529 F.2d 760, 765 (4th Cir. 1975).
 
 
 51
 Secondly, the uncontroverted evidence shows that there were actual differences between senior and junior techs. The former are more skilled, have greater ability and are expected to exercise more independence and creativity than the latter. In addition, senior techs are expected to assist junior techs when the latter have problems on the job. Senior techs were also paid more than were junior techs.
 
 
 52
 Plaintiffs' expert witness, Thomas Nisbet, testified that the pay levels of the technical jobs at NCR could be broken down into a point rating system. Under that system, the senior tech vocation was rated at a higher level than the junior tech vocation. Nisbet further testified:
 
 
 53
 "Q. In totaling the points to make a job evaluation, is age a factor?
 
 
 54
 "A. No, sir, you don't consider the employee at all when you are evaluating jobs. The employee is considered under a merit rating, the individual merit rating system. The job evaluation program is set up to set a value, an equitable value on each specific job so that you pay one job fairly in relation to the other.
 
 
 55
 "Q. But age is not a factor.
 
 
 56
 "A. Age is not a factor when you set jobs. . . . "
 
 
 57
 (App. 454-55)
 
 
 58
 Thus, the evidence established the fact that the dual classifications of electronics technicians was based on criteria other than age, that is, skill and ability. This is in our opinion, a reasonable and proper means of employee classification.
 
 
 59
 Thirdly, it is undeniable that NCR's seniority system is facially neutral, that is, its terms do not discriminate on the basis of age. The seniority system applies equally to all senior techs. No senior tech regardless of age, when he is laid off from the vocation, is permitted to bump a junior tech. Moreover, neither the seniority system nor the employment policy of NCR requires an employee to be a specified age in order to be either a senior or junior tech.
 
 
 60
 Fourthly, the evidence does not establish that the seniority system effectuated a classification of senior techs by age. At all times there were persons in each vocation who were under the age of forty, as well as those who were forty years of age and older.
 
 
 61
 Borgerding for example, did not become a junior tech until he was 42 years of age. In 1971, three of the 29 junior techs were under the age of 40. On June 1, 1974, eleven of the 18 junior techs were 40 years of age or older. Similarly, there always were persons both protected by and unprotected by the ADEA in the senior tech vocation. For example, during the period between October 13, 1972 and June 26, 1973, 21 senior techs were laid off, fourteen of whom were under the age of forty.
 
 
 62
 In light of these facts we do not believe that there is even a scintilla of evidence to support a conclusion that NCR's seniority system is not bona fide.
 
 
 63
 Furthermore, in our opinion, the evidence when viewed in a light most favorable to plaintiffs, was insufficient to justify submitting to the jury the issue whether NCR maintained the seniority system as a subterfuge to avoid the provisions of the ADEA.
 
 
 64
 In United Airlines, Inc. v. McMann, 434 U.S. 192, 98 S.Ct. 444, 54 L.Ed.2d 402 (1977), the Supreme Court defined the meaning of "subterfuge" as used in the ADEA as follows:
 
 
 65
 In ordinary parlance, and in dictionary definitions as well, a subterfuge is a scheme, plan, stratagem, or artifice of evasion. In the context of this statute, "subterfuge" must be given its ordinary meaning and we must assume Congress intended it in that sense.
 
 
 66
 Id. at 203, 98 S.Ct. at 450.
 
 
 67
 Plaintiffs noted that NCR laid off a larger number of senior techs who also had a higher average age than junior techs, despite the facts that (1) senior techs did substantially the same work as junior techs; (2) senior techs were purportedly more skilled and able than junior techs; and (3) NCR was changing its products line from mechanical business machines to electronic business machines. This reduction resulted in there being employed at the Dayton facility six senior techs, all of whom were over 40 years of age and 14 junior techs. Uncontroverted facts in Final Pretrial Order, App. at 71-72. From this reduction in work force, plaintiffs argue that the jury could reasonably infer that NCR used the separate classification of electronics technicians to rid itself of its older workers.
 
 
 68
 Plaintiffs reinforce this argument by pointing to three factors which they maintain indicate an age animus on the part of NCR, namely: (1) the fact that Morelock was once turned down for a transfer because a manager felt that at 43 years of age he was too old; (2) the fact the Company had a mandatory retirement program under which employees upon becoming age 62 years were the "subjects of 'special' managerial scrutiny and evaluation," (Plaintiff's Brief at 29); and (3) the fact that pension costs were higher for older workers.
 
 
 69
 We are unable to accept plaintiffs' contention for two reasons. First, plaintiffs entered into the following stipulation:
 
 
 70
 (24) That, during the period commencing October 13, 1972, and ending June 26, 1973, a reduction in force occurred within the Office-Technical Employees Unit described in Paragraph 14, which reduction affected the employees in Vocation 39820 Senior Development Technician. Effective on June 26, 1973, there were six employees working in Vocation 39820 Senior Development Technician, the following employees with the noted seniority and birthdates having been Reduced from such vocation during this period due to lack of work within such vocation. (Emphasis added)
 
 
 71
 Uncontroverted Facts in Final Pretrial Order, App. at 71.
 
 
 72
 A party is bound by what he stipulates. The above stipulation gives the reason why plaintiffs were laid off, namely, there was no work for senior techs. This stipulation in our opinion, should preclude the plaintiffs from claiming that they were laid off for any other reason.
 
 
 73
 Moreover, even if this stipulation were not as conclusive as we believe it to be, we hold that on the uncontroverted facts of this case, there was no evidence to raise a factual issue to submit to the jury the question whether the seniority system was employed to effect age discrimination. We do not believe that the number of senior techs laid off is so excessive in comparison with the number of junior techs laid off as to conclude that NCR, in laying off its electronics technicians, was discriminating on the basis of age.
 
 
 74
 The District Court properly entered judgment n. o. v. There is no need for us to discuss the issues raised with respect to its grant of NCR's motion for a new trial.
 
 
 75
 AFFIRMED.
 
 
 
 [1]
 In addition to the above persons, Edward Thomson was also originally a plaintiff in this action. In the Final Pretrial Order, he was dismissed as a party plaintiff
 
 
 [2]
 29 U.S.C. § 256 provides in pertinent part:
 In determining when an action is commenced for the purposes of section 255 of this title, an action commenced on or after May 14, 1947 under the Fair Labor Standards Act of 1938, as amended, the Walsh-Healey Act, or the Bacon-Davis Act, shall be considered to be commenced on the date when the complaint is filed; except that in the case of a collective or class action instituted under the Fair Labor Standards Act of 1938, as amended, or the Bacon-Davis Act, it shall be considered to be commenced in the case of any individual claimant
 (a) on the date when the complaint is filed, if he is specifically named as a party plaintiff in the complaint and his written consent to become a party plaintiff is filed on such date in the court in which the action is brought.
 
 
 [3]
 We indicated in our opinion that we would have decided the case on the merits had not the factual details of the appeal been so complex. Id. at 689 n. 19
 
 
 [4]
 In the Age Discrimination in Employment Act Amendments of 1978, Pub.L.No.95-256 § 4(a), 92 Stat. 190 (1978), Congress amended § 7(c) of the ADEA, 29 U.S.C. § 626(c) to provide for a "trial by jury of any issue of fact in (a private civil) action for recovery of amounts owing as a result of a violation of this Act, regardless of whether equitable relief is sought by any party in such action."
 
 
 [5]
 Throughout the postjudgment course of proceedings in this case, plaintiffs have repeatedly requested that the District Court be required to render findings of fact and conclusions of law with respect to the grant of judgment n. o. v. Without such findings and conclusions, plaintiffs assert that neither they nor this Court can appraise adequately the propriety of such an order
 Fed.R.Civ.Pro. 52(a) requires findings of fact and conclusions of law to be made in "(i)n all actions tried upon the facts without a jury or with an advisory jury" and "in granting or refusing interlocutory injunctions." The Rule further provides that findings of fact and conclusions of law "are unnecessary on decisions of motions under Rule 12 or 56 or any other motion except as provided in Rule 41(b)." An order granting judgment n. o. v. is not an order in which findings of fact and conclusions of law are authorized by Rule 52. See Hamilton Foundry & Mach. Co. v. International Molders & Foundry Workers Union, 193 F.2d 209, 213 (6th Cir.), Cert. denied, 343 U.S. 966, 72 S.Ct. 1060, 96 L.Ed. 1363 (1952); Cf. O'Brien v. Westinghouse Elec. Corp., 293 F.2d 1, 8 (3d Cir. 1961) (findings of fact not necessary in granting a motion for a directed verdict).
 We note however, that in our opinion, it is the better practice in cases such as the instant case, in which the facts are complex, for a trial court to delineate with specificity its reasons for the grant of judgment n. o. v. rather than merely stating conclusively, as did the District Court here, that there was no substantial evidence to support the jury's verdict. By setting forth its reasons for granting judgment n. o. v., the trial court aids both the parties on appeal and the appellate court in their review of the evidence.
 
 
 [6]
 Developmental Electronics Technicians were referred to as "junior techs" by NCR's Dayton employees. Hereinafter, we also will use that designation
 
 
 [7]
 The 1964 collective bargaining agreement provided that employees in the RDE Area who were laid off from their vocations could bump back into prior vocations in which they had worked in the RDE Area. Thus, a laid-off senior tech who had been a junior tech prior to becoming a senior tech, could bump back into the junior tech vocation provided he had more seniority than the junior tech with the least seniority
 Plaintiffs maintain that the 1964 agreement permitted all senior techs to bump back into the junior tech vocation when they were laid off because one had to be a junior tech prior to becoming a senior tech. Although a statement made by Borgerding on redirect examination supports this position (App. at 665-666), we note that only one of the plaintiffs had been a junior tech prior to becoming a senior tech, namely, Borgerding. The other plaintiffs were all electronics technicians at the time the 1964 agreement became effective and were reclassified as senior techs at that time. There is no evidence other than the opinions of these plaintiffs that they, never having been junior techs, could have bumped into the junior tech vocation under the 1964 agreement. The collective bargaining agreement as we read it, does not so provide. Nevertheless, the effect of the elimination of the right of RDE Area employees to bump back into prior vocations in which they had worked, did work to effectuate a complete segregation between the senior and junior tech vocations by eliminating the rights of senior techs (including Borgerding) who had been junior techs, to revert to that position when they were laid off as senior techs.
 
 
 [8]
 See e. g., Taylor v. Cirino, 321 F.2d 279, 281 (6th Cir. 1963); Solomon v. United States, 276 F.2d 669, 672 (6th Cir.), Cert. denied, 364 U.S. 890, 81 S.Ct. 219, 5 L.Ed.2d 186 (1960); Hinton v. Dixie Ohio Exp. Co., 188 F.2d 121, 124 (6th Cir. 1951) (directed verdict)
 
 
 [9]
 See e. g., Fontana Aviation, Inc. v. Beech Aircraft Corp., 432 F.2d 1080, 1084 (7th Cir. 1970); Business Dev. Corp. of N.C. v. United States, 428 F.2d 451, 453 (4th Cir.), Cert. denied, 400 U.S. 957, 91 S.Ct. 355, 27 L.Ed.2d 265 (1970); Boeing Co. v. Shipman, supra, 411 F.2d at 373-77
 
 
 [10]
 This test has been phrased by this Court as follows: "(A) judgment n. o. v. may not be granted unless reasonable minds could not differ as to the conclusions to be drawn from the evidence." Gillham v. Admiral Corp., 6 Cir., 523 F.2d 102, 109 (1975), Cert. denied, 424 U.S. 913, 96 S.Ct. 1113, 47 L.Ed.2d 318 (1976)
 
 
 [11]
 In the Age Discrimination in Employment Act Amendments of 1978 Pub.L.No. 95-256, § 3(a), 92 Stat. 189 (1978), Congress extended the upper age limit of the ADEA to 70. This change becomes effective on January 1, 1979
 
 
 [12]
 Plaintiffs do not assert that NCR's seniority system is not bona fide in the sense that it is not authentic or genuine. The evidence is uncontroverted that NCR did have a seniority system and that it literally followed that system in implementing its reduction in force