Sammie J. RODGERS, Plaintiff,

v.

**FISHER BODY DIVISION, GENERAL MOTORS CORPORATION, Defendant.**

No. G79–514 CA.

United States District Court,
W.D. Michigan, S.D.

Nov. 24, 1982.

Frances McIntyre-Leonard, Detroit, Mich., for plaintiff.

Thomas G. Buford, Howard & Howard, Kalamazoo, Mich., for defendant.

## OPINION

BENJAMIN F. GIBSON, District Judge.

This is an employment discrimination action pursuant to 42 U.S.C. § 1981. Plaintiff alleged that he was a victim of intentional racial discrimination because he was separated from his employment as a temporary plant security guard while another was offered a permanent guard position. After four days of trial a jury awarded plaintiff $300,000 as compensatory damages and $500,000 as punitive damages. Presently before the Court are defendant's motion for judgment notwithstanding the verdict (judgment n.o.v.) and motion for new trial or in the alternative, for remittitur.

Defendant contends that the award of punitive damages is unsupported by the evidence and excessive, and that the verdict is against the weight of the evidence. It also argues that the Court erred in its instruction on punitive damages, that the jury was improperly allowed to interpret the collective bargaining agreement, and that the verdict was in part caused by improper and prejudicial closing argument.

■ The preferred formulation of the standard for deciding a motion for judgment n.o.v. is that it should be granted only when reasonable minds could not differ that the conclusions to be drawn from the evidence should be in favor of the moving party. On the other hand, a judgment n.o.v. should be denied where there is sufficient evidence to raise a question of fact for the jury. *Morelock v. NCR Corp.*, 586 F.2d 1096 (6th Cir.1978) *cert. denied*, 441 U.S. 906, 99 S.Ct. 1995, 60 L.Ed.2d 375 (1979). The *Morelock* court stated further:

> In determining whether the evidence is sufficient, the trial court may neither weigh the evidence, pass on the credibility of witnesses nor substitute its judgment for that of the jury. Rather, the evidence must be viewed in the light most favorable to the party against whom the motion is made, drawing from that evidence all reasonable inferences in his favor.

586 F.2d at 1104. *Accord, Hildebrand v. Board of Trustees of Michigan State University*, 662 F.2d 439 (6th Cir.1981), *cert.*

**14**

denied, 456 U.S. 910, 102 S.Ct. 1760, 72 L.Ed.2d 168 (1982).

■ In contrast to testing the legal sufficiency of the evidence in a motion for judgment n.o.v., a motion for new trial "is confined almost entirely to the exercise of discretion on the part of the trial court." *Allied Chemical Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36, 101 S.Ct. 188, 191, 66 L.Ed.2d 193 (1980). A new trial may be granted where the verdict rendered is contrary to the clear weight of the evidence, or excessive, or to prevent a miscarriage of justice. *Peacock v. Board of Regents*, 597 F.2d 163 (9th Cir.1979). A new trial would also be warranted when a verdict is reached on account of bias, passion, prejudice, corruption or other improper motive. *King v. Ford Motor Co.*, 597 F.2d 436 (5th Cir.1979). However, a trial court does not properly grant a new trial merely because it might have come to a result different from that reached by the jury. *Rios v. Empresas Lineas Maritimas Argentinas*, 575 F.2d 986 (1st Cir.1978).

■ In the exercise of its discretion the trial court may condition an order for a new trial upon the failure of the plaintiff to remit a portion of the award which the court deems excessive. *See Burnett v. Coleman Co.*, 507 F.2d 726 (6th Cir.1974). Such remittitur requires the trial judge to exercise a mature, judicial discretion in viewing the verdict in the light of the whole setting of the trial, the character of the evidence, and the complexity or simplicity of the legal and factual issues; and his discretion should be exercised to nullify a seriously erroneous result and to prevent a miscarriage of justice. 6A Moore's Federal Practice ¶ 59.05[3] (2d ed. 1982). An abuse of discretion in granting remittitur will be found only where the quantum of damages found by the jury was clearly within the maximum limit of a reasonable range. *Smith v. John Swafford Furniture Co., Inc.*, 614 F.2d 552 (6th Cir.1980).

Thus, the motions before the Court require careful scrutiny of the entire record. The evidence at trial established that plaintiff was a well-qualified candidate for a position as plant security guard. He had some military experience and two years of specialized training in scientific crime detection as well as three years' experience as a security guard in a shopping center. Although it was unusual for plant patrolmen to have any education beyond high school, plaintiff had completed a master's degree. The chief of security recorded among his interview conclusions that plaintiff "seems very capable" and "would probably make a very good employ."

Plaintiff was one of several temporary guards to be hired as vacation replacements. He was told from the start that he would be in the running for a permanent position which was expected to open up during his period of temporary employment. Plaintiff was very interested in a permanent position and was quite conscious of performing his job well—he avoided absenteeism and tardiness, and never refused a request for overtime work, working in 5½ months a total of 272 hours over and above the regular 48-hour work week.

On June 21, 1977, several days after plaintiff was hired, Jeffrey Bodary, a white man who eventually received the permanent position, was also hired as a temporary guard. He too was considered well-qualified, with some college training in law enforcement, and was hoping for a permanent position as well.

Mr. Bodary received two full weeks of training, while plaintiff was trained for only three or four days. There was testimony which suggested that Mr. Bodary received some coaching from his superiors about how to make himself look good as a candidate for the permanent position, whereas plaintiff did not receive such coaching.

A notation appears on Mr. Bodary's personnel record as follows: "Starting 9–5–77 will replace O. Kent who retired." September 5 was less than halfway through the six-month probationary period which plaintiff was told would be the basis of the decision about the permanent position. At trial, no one from General Motors was able to identify the source of this notation or

explain it with anything more than conjecture.

In October and November, plaintiff was "written up" on an Officer's Special Report on several occasions. Plaintiff had credible explanations for each and every one of these incidents. One report involved late relief at a post by plaintiff as part of a relay system. Plaintiff explained that there had been a mix-up over the location of the field glasses, and that, pursuant to common practice, he had stopped at the infirmary for some cold relief medication. There was testimony that late relief was not uncommon, and that no one had ever been written up for late relief before.

A second incident involved plaintiff crossing a trainwell by climbing on a boxcar in an area where signs warned pedestrians not to do so. Plaintiff testified that there were other areas in the plant where warning signs were not considered applicable to patrolmen, that no one ever told him this one was any different, and that he had done so in an effort to comply with two urgent directions from a foreman and the dispatcher.

A third incident involved an alleged failure to follow appropriate fire reporting procedures or give the correct location. However, there was testimony that plaintiff reported the location as it was told to him, and that plant firemen could not be notified because they were not on duty at the time.

A final incident involved an accusation of stealing candy from the company canteen. The accusation was based on the presence of plaintiff's logbook in the canteen, but plaintiff explained to Chief Rosen's satisfaction that plaintiff had unlocked the canteen for an authorized employee and had mistakenly left the logbook there in the process of doing so.

In late November, plaintiff was called into a meeting with Chief Rosen and others. These previous incidents were discussed, and plaintiff was told that Jeff Bodary had been selected for the permanent position and that plaintiff would be laid off. Plaintiff repeatedly asked for union representation at this meeting but was denied. Plaintiff testified that Chief Rosen put his arm around plaintiff's shoulders and stated, "You don't think there's anything racial involved in this incident, to [sic] you."

Following his separation from employment, plaintiff filed a grievance which the union pursued through several steps. It was contended, among other things, that since plaintiff was hired before Mr. Bodary, and they were both qualified for the permanent position, plaintiff should have been offered it by virtue of his seniority. Mr. Bodary testified that that had been his understanding. The plant management contended that plaintiff had no seniority rights as a temporary employee under the national collective bargaining agreement.

Plaintiff attempted to transfer to another G.M. facility which had openings. He was told that he could not be hired because the Fisher Body plant at which he had worked was giving him a bad reputation. Plaintiff's union representative, Lyle McFadden, testified that at a meeting with Chief Rosen they discussed whether plaintiff had been "disciplined" or laid off:

> So, I turned to him and I said okay, if Sammie Rodgers was laid off, everybody else that's been laid off at Fisher Body put in an application at Olds, they are hiring, why can't he go over there and be hired. Rosen then turned and laughed and said I wouldn't do that to Husby, Chief Husby at Oldsmobile. And so, I said, so you are telling me a story then that there is something that you are not telling me. There is something, there is more to his layoff than just the layoff. And, he said he was not free at that time to discuss it with me, what it was.

Plaintiff also was initially refused unemployment compensation because defendant reported that plaintiff had been fired rather than laid off.

The evidence established that generally minorities in plant security at the plant were proportionately well-represented, but not at the upper levels. Chief Rosen indi-

cated that he had once offered to promote a black patrolman to sergeant, but the officer declined. Jeff Bodary testified that he doesn't believe that blacks in the department are more lazy and poorer officers than whites, but had the following to say about four of the five black plant patrolmen: "I don't think that—this is going to sound bad, but I believe that I have seen them lazy, slow, disinterested, sleeping, I don't recall ever writing special reports, just poor officers in general."

Plaintiff's theory of the case was that there was a concerted effort or conspiracy to deny him the permanent position in favor of Jeff Bodary on the basis of race. He argued that the late relief incident in particular appeared to be a "set-up." Defendant's theory was that it simply exercised its right to choose among qualified candidates, and there was no racial motivation involved. The jury clearly determined that the evidence demonstrated intentional discrimination which was malicious, willful, or at least recklessly indifferent to plaintiff's rights.

■ The Court has carefully reviewed the record, including but not limited to the evidence highlighted above. The Court has also reviewed the post-trial briefs of counsel and has heard oral argument on the post-trial motions. The Court is of the opinion based on the entire record that there was clearly sufficient evidence of discrimination to raise a question of fact for the jury, and that reasonable minds could differ as to the conclusions to be drawn from the evidence. Accordingly, the motion for judgment n.o.v. is denied.

Among the arguments raised in support of a request for new trial is that the verdict is against the weight of the evidence. Based on the same considerations, the Court finds that this is not a case where the verdict is so clearly against the weight of the evidence that a new trial is warranted.

Defendant contends that the verdict is excessive, in particular with respect to the awards for mental distress and punitive damages. Plaintiff requested some $220,-000 for lost wages, past and future, so some portion of the $300,000 in compensatory damages appears to be for mental pain and suffering. The primary evidence in this regard was plaintiff's testimony concerning the humiliation he suffered from having to go on welfare after he was "laid off" but unable to receive unemployment compensation. The Court is reluctant to disagree with the jury's valuation of this very individualized experience. A determination of the proper compensation for a deprivation of one's civil rights is, by its nature, highly subjective. *Busche v. Burkee,* 649 F.2d 509, 519 (7th Cir.1981), *cert. denied,* 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212.

In this case the record indicates that plaintiff was a hard-working model citizen. His resume discloses a lengthy employment history including several positions with significant elements of contribution to the community in the field of education and as a probation officer. He also appears to have been active in voluntary public service, having received certificates of appreciation from two United States presidents. He had never been on welfare before, and had a wife and child to support. He testified that the welfare payments weren't really enough to sustain his family and himself, and that his car was repossessed during this time. Knowing that defendant had given him "a bad reputation" when he applied for a job at Oldsmobile, he may have wondered if such reports would prevent him from ever working again.

■ In addition to such testimony, "[H]umiliation can be inferred from the circumstances .... [Plaintiff] was subjected to a racial indignity which is one of the relics of slavery which [42 U.S.C. § 1981] was enacted to eradicate." *Seaton v. Sky Realty Company, Inc.,* 491 F.2d 634, 636 (7th Cir.1974). *See Jones v. Alfred H. Mayer Co.,* 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968). This Court is unwilling to conclude that the jury overvalued the mental distress suffered by a person of plaintiff's background and circumstances over a period of seven months, and there-

fore finds that the compensatory damages award was within the maximum limit of a reasonable range.

The $500,000 award for punitive damages is also challenged by defendant. It is argued that the Court erred in its instruction on punitive damages. The Court charged the jury as follows:

The Plaintiff also claims that the acts of the Defendant were done with malice or with callous and reckless indifference to Plaintiff's rights so as to entitle him to an award of punitive damages in addition to compensatory damages, or in addition to nominal damages, such as you find.

If you find for the Plaintiff, and if you further find that the Defendant did act with malice, or with callous and reckless indifference to the rights of others, the law would allow you, in your discretion, to assess punitive damages against the Defendant as punishment and as a deterrent to others.

If you find that punitive damages should be assessed against the Defendant, you may consider the financial resources of the Defendant in fixing the amount of such damages. Any award of punitive damages must be separately stated in your verdict.

This instruction was based on the Fifth Circuit's Pattern Jury Instructions, Damages Instructions No. 8, with modifications. The Court is of the opinion that the instruction given clearly, adequately, and succinctly informs the jury of: 1) the standard of conduct which justifies an award of punitive damages, 2) their discretion in assessing an amount, if any, 3) the purposes of such an award, and 4) their ability to consider the financial resources of the defendant. The Court disagrees with defendant that the jury needed definitions of "malice" and "callous or reckless indifference to the rights of others." The Court feels it is clear from the instruction that punitive damages are only awarded in exceptional circumstances where behavior of such character is present, so that punitive damages need not be specifically labelled "extraordinary." An instruction that "punitive dam-

ages are disfavored by the law," as requested by defendant, would add nothing to understanding and perhaps inject confusion—punitive damages are warranted in certain circumstances and not in others; they are not always "disfavored." Finally, the fact that damages should be awarded "with calm discretion" was apparent from the instructions taken as a whole. Thus, the Court concludes that a new trial is not warranted on the basis of the jury instruction on punitive damages.

It is also argued that there was no evidence to support an award of punitive damages. However, it appears that the jury accepted plaintiff's theory of a deliberate conspiracy and set-up, for which there was some evidence. It clearly then could find that in addition to bare intentional discrimination there was malice, or callous and reckless indifference to plaintiff's rights. Once it decided that punitive damages should be assessed to punish defendant and deter others, the jury could properly consider, as plaintiff argued, the multi-billion-dollar financial resources of defendant. *See Fountila v. Carter*, 571 F.2d 487, 492 (9th Cir.1978) (wealth of defendant an important factor for jury to consider in awarding punitive damages); D. Dobbs, Remedies § 3.9, pp. 218–19 (1973). The size of an award which is necessary to make General Motors Corporation take steps to discharge its legal responsibilities, rather than be regarded as an inconvenient cost of doing business, is clearly a judgment call. Defendant had the burden and opportunity to show that a more modest amount would have been sufficient to achieve the purpose of punitive damages. *See Zarcone v. Perry*, 572 F.2d 52, 56 (2d Cir.1978), *cert. denied*, 439 U.S. 1072, 99 S.Ct. 843, 59 L.Ed.2d 38 (1979). While this Court might not have reached the same result, it cannot say that the jury determined an award of punitive damages which is clearly outside the maximum limit of a reasonable range for the defendant in this case.

Two remaining arguments of the defendant will be given brief attention.

The first is that the jury was improperly allowed to interpret the collective bargaining agreement. The evidence showed that the local union disputed defendant's claim that the union contract provided no seniority for temporary security officers. It is settled that "the industrial common law—the practices of the industry and the shop—is equally a part of the collective bargaining agreement although not expressed in it." *United Steelworkers v. Warrior and Gulf Navigation Co.*, 363 U.S. 574, 581–82, 80 S.Ct. 1347, 1352, 4 L.Ed.2d 1409 (1960). Since there was a conflict in the evidence concerning the collective bargaining agreement as supplemented by local past practice, the issue was a proper one for the jury to resolve. In addition, it should be noted that defendant never requested this Court to interpret the collective bargaining agreement as a matter of law; it simply requested an erroneously sweeping jury instruction that "an employer is not required by law to base its employment decisions on an applicant's length of service."

Defendant's final argument is that plaintiff's counsel's closing argument was improper and prejudicial in that she stressed defendant's size and wealth, urged her personal opinions upon the jury, and allegedly implied that opposing counsel had suborned perjury. Defendant refers the Court to the cases of *City of Cleveland v. Peter Kiewit Sons' Co.*, 624 F.2d 749 (6th Cir.1980), and *Draper v. Airco, Inc.*, 580 F.2d 91 (3rd Cir.1978). In *Kiewit* plaintiff's counsel improperly strove to inform the jury of defendant's wealth "at every opportunity," and he improperly brought up the subject of insurance coverage "pointedly, unambiguously, repeatedly, and deliberately" despite constant objections by opposing counsel and recurrent reprimands from the trial judge. The Court observed that "the improprieties permeated the entire trial, from opening statement through closing argument, in 'a continuing pattern of misconduct.'" 624 F.2d at 758. In *Draper*, plaintiff's counsel committed the following improprieties:

(1) he attempted to prejudice the jurors through repeated inappropriate references to the defendants' wealth; (2) he asserted his personal opinion of the justness of his client's cause; (3) he prejudicially referred to facts not in evidence; and (4) without provocation or basis in fact, he made several prejudicial, vituperative and insulting references to opposing counsel.

580 F.2d at 91.

■ This case does not approach the "flagrant misconduct" described in the above cases. Neither of them involved a claim for punitive damages. Thus, argument concerning defendant's size and wealth which was prejudicial in those cases was legitimate and relevant in this case. The remarks which defendant complains of were made in rebuttal to an accusation that plaintiff wanted to be a "millionaire" and a "wheel." Moreover, as the Sixth Circuit noted in *Kiewit*, the name General Motors is probably already synonymous among the general public with "corporate giant," so the remarks could not have added much information anyway. Other distinctions between this case and the two cited by defendant are that defendant never objected to plaintiff's counsel's closing argument until now, and that the remarks complained of were isolated.

In considering "the totality of the circumstances, including the nature of the comments, their frequency, their possible relevancy to the real issues before the jury, the manner in which the parties and the court treated the comments, the strength of the case (e.g. whether it is a close case), and the verdict itself," *Kiewit*, 624 F.2d at 756, this Court finds that any improper comments were not so prejudicial as to require a retrial.

The Court concludes that the verdict is supported by the evidence and is not excessive, and that neither a new trial nor remittitur should be granted. As the Sixth Circuit stated in upholding an award of compensatory and punitive damages in a § 1983 action for an unlawful beating by police, "Under these circumstances this

Court will not invade the particular province of the jury in evaluating the value of plaintiff's civil rights."